

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-25-00137-CR

_____

WILLIAM NEVILLES, Appellant

V.

THE STATE OF TEXAS

_____

On Appeal from the 213th District Court
Tarrant County, Texas
Trial Court No. 1807516

_____

Before Birdwell, Wallach, and Walker, JJ.
Memorandum Opinion by Justice Wallach

## MEMORANDUM OPINION

The jury convicted Appellant William Nevilles of indecency with a child by contact, two counts of aggravated sexual assault of a child, and aggravated kidnapping. Tex. Penal Code §§ 20.04, 21.11, 22.021. He was sentenced to life imprisonment for each count, to be served consecutively. In ten points, he challenges the sufficiency of the evidence to support his convictions for aggravated kidnapping and aggravated sexual assault, argues that his indecency-with-a-child conviction constitutes double jeopardy, complains of the jury charge and the trial court's evidentiary rulings, and argues that the trial court's stacking of his sentences constitutes cruel and unusual punishment. We will affirm.

### Background

Eight-year-old Grace[1] accompanied her mother to Walmart, and at the end of their shopping, her mother allowed her to go back to another aisle to get a toy. As Grace was heading back toward where her mother was waiting in the checkout area, she was intercepted by Appellant William Nevilles, who told her that he was a Walmart employee, that she had been stealing, and that she needed to go with him. He took her to the auto care section of the store and put his hand into her pants.

---

[1]We use an alias for the child to protect her privacy. *See* Tex. R. App. P. 9.8 cmt., 9.10(a)(3); *McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982).

Nevilles then took Grace into a breakroom[2] near the auto care area, where he again put his hands into her pants, touching her "private part" she uses "to go pee" and moving his hand up and down.[3] There were no employees in the area at that time. He then took Grace out of that room, moved her into the arts and crafts area, and then took her back toward where the breakroom was located. However, instead of taking her back into the breakroom, he took her through a closed door into a dark stockroom. Leaving the lights off, he pulled down Grace's pants and underwear, got behind her, and told her to bend over. Grace resisted, so Nevilles turned her around to face him, bent down, and "put his mouth in [her] private part."

When a Walmart employee went to his counter outside the stockroom, he heard Grace crying. He went into the stockroom, where the lights were still off. When he turned on the lights, Grace was crying and pulling up her pants. Nevilles told the employee that he had been looking for a place to "whoop" his daughter. Nevilles left the stockroom, holding Grace's hand and taking her with him.

---

[2]Other testimony suggests that the room might have been a waiting area for customers having their cars serviced at Walmart's auto center, but Grace referred to it as the "lunch break room."

[3]Because the breakroom has windows, a surveillance camera placed outside the room captured Nevilles and Grace entering the room. Nevilles and Grace were facing away from the camera, but Nevilles was recorded standing right next to Grace and leaning over her, with his left hand on her back. His right hand was not visible in the video.

After leaving the stockroom, Nevilles let Grace go, and she ran back to her mother and told her what had happened. Her mother had been looking for her and trying to obtain assistance from employees, but she spoke only Spanish and had difficulty finding an employee who spoke Spanish. After she was eventually able to communicate with someone, employees called 911 and provided video surveillance footage to the responding officer. Grace was examined by a sexual assault nurse examiner, who took swabs as part of her exam. DNA testing was performed on a swab of Grace's inner labia, and the forensic DNA analyst who performed the testing testified that Nevilles could not be excluded as the contributor for the DNA profile found in the sample.

Before trial, the State notified Nevilles that it intended to seek an enhanced sentence on the basis that, in 2000, he had been convicted in Tennessee of statutory rape. *See Brooks v. State*, 957 S.W.2d 30, 34 (Tex. Crim. App. 1997) (holding that "prior convictions used as enhancements must be pled in some form"). At trial, the trial court admitted State's Exhibit 3, consisting of various Tennessee court documents related to a 2000 charge against Nevilles for statutory rape.

Nevilles had previously objected to admission of Exhibit 3 at a hearing held the day before testimony had begun. At the hearing, Nevilles objected that the Tennessee documents reflected "a voidable judgment and shouldn't be admissible or useable" for purposes of punishment enhancement because the sentence assessed was 120 days' confinement, which Nevilles argued was below the minimum punishment in

4

Tennessee for statutory rape. The trial court went off the record, and when the hearing went back on the record, the court allowed Nevilles's attorney to make a record. The attorney argued that the Tennessee judgment was inadmissible "for purposes of the *Brooks* notice" because it was "voidable and voided," but if admitted at the guilt/innocence stage, that would "effectively prove[ ] up [the State's] *Brooks* notice for punishment purposes later," which was improper, and so "under 403," he "request[ed] that it be kept out." [Italics added.] The trial court overruled the objection. Then at trial, Nevilles "reurge[d] [his] same objection," which the trial court again overruled.

During trial, the State presented testimony that police investigations of the Walmart incident had led officers to conduct surveillance outside of Nevilles's home; that they had followed him to a shopping center, where he parked for several minutes outside a part of the shopping center with an indoor children's playground; and that Nevilles had approached one of the officers to ask why he was being followed. The trial court admitted the testimony over objection.

At the jury charge conference, Nevilles requested inclusion of unlawful restraint as a lesser-included offense. The trial court denied that request.

The jury found Nevilles guilty on all counts and, for each count, assessed punishment at life imprisonment. The trial court sentenced him accordingly and ordered that the sentences run consecutively.

5

## Discussion

## I. Evidentiary sufficiency to prove aggravated sexual assault (1st point)

In his first point, Nevilles contends that the evidence was insufficient to prove beyond a reasonable doubt that he committed aggravated sexual assault of a child by penetrating Grace's sexual organ with his finger as alleged in count two of the indictment.

### A. Standard of review

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Baltimore v. State*, 689 S.W.3d 331, 341 (Tex. Crim. App. 2024). The factfinder alone judges the evidence's weight and credibility, *see* Tex. Code Crim. Proc. art. 38.04; *Martin v. State*, 635 S.W.3d 672, 679 (Tex. Crim. App. 2021), and thus we may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's, *Baltimore*, 689 S.W.3d at 342. Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Edward v. State*, 635 S.W.3d 649, 655–65 (Tex. Crim. App. 2021); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume that the factfinder resolved any conflicting

inferences in favor of the verdict, and we must defer to that resolution. *Edward*, 635 S.W.3d at 656.

To determine whether the State has met its burden to prove a defendant's guilt beyond a reasonable doubt, we compare the crime's elements as defined by a hypothetically correct jury charge to the evidence adduced at trial. *Id.*; *see Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018) ("The essential elements of an offense are determined by state law."). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Baltimore*, 689 S.W.3d at 341. The law as authorized by the indictment means the statutory elements of the offense as modified by the charging instrument's allegations. *Curlee v. State*, 620 S.W.3d 767, 778 (Tex. Crim. App. 2021); *see Rabb v. State*, 434 S.W.3d 613, 617 (Tex. Crim. App. 2014).

## B. Relevant Evidence

To prove sexual assault of a child as alleged in the indictment, the State had to prove that Nevilles caused the penetration of Grace's sexual organ. Tex. Penal Code § 22.021(a)(1)(B)(i), (2)(B). Nevilles challenges the evidentiary sufficiency to prove this element. He acknowledges that circumstantial evidence can prove guilt, but he argues that the circumstantial evidence in this case is "more speculative than inferential." Nevilles argues that "[t]he only evidence relevant to penetration presented at trial was: (1) [Grace] telling [the nurse who performed the sexual assault exam] she 'thinks' [his]

7

finger went 'between the lines' and beyond the external genitalia; and (2) the presence of male DNA attributable to [his] paternal lineage on [Grace]'s inner labia."

Grace was nine at the time of trial, and in her testimony, she said that Nevilles had taken her to the breakroom, where he used his hands to touch her underneath her clothes "[b]etween [her] legs" on her "private part" that she uses "[t]o go pee," and that while he was touching her, his hands were moving. She was not asked for any further details.

The nurse who performed the sexual assault examination of Grace testified about her examination of Grace. The nurse explained that she had shown Grace a diagram to ask her where she had been touched and relayed what Grace had said in response:

> And so, at that point, I was talking to her about genitalia and trying to figure out where on her anatomy that was touched. And we do this thing where we -- you know, some people use diagrams. That's hard for kids sometimes, but sometimes it works. I usually show them or point, and I say, "Okay. So let's say this is the line where the pee comes out right here. Can you show me where he touched you or where you were touched?"
>
> And so she -- we were able to figure out from there that it was inside the line. So that means past the external genitalia.
>
> And she said, "Inside the line, I think. I'm pretty sure. He took me to where there was a big TV. He made me take off my pants and my underwear. He put his hand, and it was going up and down.

The nurse then said that a child may give her a narrative during an exam, "but they don't really understand what [the nurse] need[s] . . . for [her] diagnosis and

treatment," so she "let[s] them tell the narrative, and then [she] go[es] back and ask[s] specific questions." The prosecutor asked the nurse if, in following up with those specific questions, she had asked Grace about whether there had been any vaginal contact or penetration by Nevilles with his hand. The nurse responded that she had asked about it and that "[Grace] said yes." The nurse had also asked if Grace had experienced any pain associated with it, and Grace had said, "'Yes, it hurt when he was going up and down.'"

The nurse further testified that to find someone's DNA on Grace's inner labia—as was found in this case—would have required penetration. The forensic analyst who tested the swab told the jury that although the lab can potentially identify the presence of blood or semen, the lab does not test for the presence of saliva, and it does not have tests to determine if DNA came from "a skin cell versus anything else."

Nevilles maintains that the evidence does not prove his guilt beyond a reasonable doubt because Grace's statement to the nurse was not definite and because, since the forensic analyst could not say whether the DNA on Grace's labia came from saliva or skin cells, the DNA could have come from his saliva when he committed the separate offense of contacting her genitals with his mouth.

**C. Analysis**

A person commits aggravated sexual assault of a child if the person "causes the penetration of the anus or sexual organ of a child by any means." *Id.* § 22.021(a)(1)(B)(i). For purposes of the statute, proving penetration of a female

9

child's sexual organ does not require proof of penetration into the child's vagina. *Cornet v. State*, 359 S.W.3d 217, 226 (Tex. Crim. App. 2012). Courts have held that "pushing aside and reaching beneath a natural fold of skin into an area of the body not usually exposed to view, even in nakedness, is a significant intrusion beyond mere external contact," *Green v. State*, 476 S.W.3d 440, 447 (Tex. Crim. App. 2015) (quoting *Vernon v. State*, 841 S.W.2d 407, 409–10 (Tex. Crim. App. 1992)), and thus, "[p]enetration occurs so long as contact with the female sexual organ 'could reasonably be regarded by ordinary English speakers as more intrusive than contact with [complainant's] outer vaginal lips.'" *Nouvel v. State*, No. 05-23-00788-CR, 2025 WL 464856, at *8 (Tex. App.—Dallas Feb. 11, 2025, no pet.) (mem. op., not designated for publication) (quoting *Manzanarez v. State*, No. 05-22-00671-CR, 2024 WL 260481, at *2 (Tex. App.—Dallas Jan. 24, 2024, no pet.) (mem. op., not designated for publication)); *see Cornet*, 359 S.W.3d at 226 (stating that "penetration occurs when there is 'tactile contact beneath the fold of complainant's external genitalia'" (quoting *Vernon*, 841 S.W.2d at 409)).

Nevilles focuses on Grace's statement to the nurse that she was "pretty sure" that he touched her "inside the line," a statement that he characterizes as a "guess." But the jury heard more than that.

Grace testified that Nevilles's hands were moving when he touched her "private part," and she said that this occurred when he took her to the breakroom. Further, the nurse relayed that Grace told her not only that she was "pretty sure" that

10

Nevilles touched her "inside the line," but also that his hand was "going up and down," which hurt. A child is not expected or required to express herself with the same level of sophistication and detail as an adult. *Turner v. State*, 573 S.W.3d 455, 459 (Tex. App.—Amarillo 2019, no pet.); *see also Zamarripa v. State*, No. 13-19-00271-CR, 2020 WL 7063295, at *2 (Tex. App.—Corpus Christi–Edinburg Dec. 3, 2020, no pet.) (mem. op., not designated for publication) ("The child complainant's description of the abuse need not be precise."). The jury could infer from these parts of Grace's and the nurse's testimony that penetration had occurred. *See Blount v. State*, No. 05-16-00014-CR, 2016 WL 6087676, at *2 (Tex. App.—Dallas Oct. 18, 2016, pet. ref'd) (mem. op., not designated for publication); *see also Garcia v. State*, No. 05-23-01173-CR, 2025 WL 863490, at *4 (Tex. App.—Dallas Mar. 19, 2025, no pet.) (mem. op., not designated for publication). *Cf. Cantu v. State*, 678 S.W.3d 331, 359 (Tex. App.—San Antonio 2023, no pet.) (stating that from child's testimony of experiencing pain was evidence from which jury could rationally conclude that "at least minimal penetration" of child's anus had occurred). Further, the nurse testified that she had specifically asked Grace if penetration had occurred, and Grace had said yes. We overrule Nevilles's first point.

## II. Double jeopardy (3rd point)

In Nevilles's third point, he argues that he has been placed in double jeopardy because he has been convicted and sentenced twice for the same conduct. Specifically, he argues that "if this Court finds the evidence sufficient to convict [him] of

penetrating [Grace]'s sexual organ with his finger [count two], it cannot uphold both that conviction and the conviction for Indecency with a Child by Contact [count three]" because "[t]he allegations against [him], and the evidence adduced at trial, charged him with those two separate offenses for the same conduct: touching [Grace]'s genitals with his hand."

## A. Double Jeopardy and Sexual Offenses

Nevilles did not raise his double-jeopardy complaint in the trial court, but a double-jeopardy claim may be raised for the first time on appeal if (1) "the undisputed facts show that the double-jeopardy violation is clearly apparent on the face of the record"; and (2) "enforcement of the usual rules of procedural default serves no legitimate state interest." *Ex parte Denton*, 399 S.W.3d 540, 544 (Tex. Crim. App. 2013). "A double-jeopardy claim is apparent on the face of the trial record if resolution of the claim does not require further proceedings for the purpose of introducing additional evidence in support of the double-jeopardy claim." *Id.*

"A person who commits more than one sexual act against the same person may be convicted and punished for each separate and discrete act, even if those acts were committed in close temporal proximity. The key is that one act ends before another act begins." *Aekins v. State*, 447 S.W.3d 270, 278 (Tex. Crim. App. 2014). But if a defendant "is convicted or punished for two offenses that are the same both in law and in fact," a double-jeopardy violation occurs. *Id.* at 279. Thus, "a defendant may not be convicted for a completed sexual assault by penetration and also for conduct

12

(such as . . . contact) that is demonstrably and inextricably part of that single sexual assault." *Id.* at 281. On the other hand, while "penetration necessarily requires contact, . . . contact does not require penetration," and thus "if an indecent contact is not simply preparatory to an act of penetration, the contact is itself a complete, ultimate act." *Wade v. State*, No. 02-21-00125-CR, 2023 WL 2534468, at *14 (Tex. App.—Fort Worth Mar. 16, 2023, pet. ref'd) (mem. op., not designated for publication) (internal quotation marks and citations omitted).

Nevilles argues that the indecency with a child offense was a lesser-included offense of the aggravated sexual assault of a child offense and was subsumed into the greater offense, that "the record is clear that the State charged [him] with two offenses stemming from one alleged act: penetrating [Grace]'s sexual organ while in the process of touching her genitals," and that "[t]here was no evidence or testimony that two separate acts took place." *See Aekins*, 447 S.W.3d at 280 ("Where two crimes are such that the one cannot be committed without necessarily committing the other, then they stand in the relationship of greater and lesser offenses, and the defendant cannot be convicted or punished for both."). The State argues that the jury had before it evidence that in addition to taking Grace to the breakroom to commit the aggravated sexual assault charged in count two, Nevilles also took her to a store aisle and committed the indecency-by-contact offense charged in count three.

13

**B. Application**

As to count three, when Grace testified, she did not know if Nevilles had taken her to the auto care area. However, her mother testified that right after the incident, Grace told her that he had taken her not only to "this dark room" but also to "the auto care area." Her mother further testified that Grace had said that he had "suck[ed] her private parts" and had used his hand to touch "her private parts."

Her testimony was not perfectly clear about which act had occurred where, but the nurse similarly testified that Grace's mother had reported to her that Grace had said that Nevilles had taken her to the art department and "touched her inappropriately." Although these statements were conflicting about whether the touching had occurred in the art section or the auto care section, the mother's testimony and her statement to the nurse were consistent about Grace reporting that Nevilles had contacted her genitals with his hand in a store aisle. Additionally, the trial court admitted Walmart security camera footage that appears to corroborate this testimony. The video lacks the clarity to make Nevilles's actions explicit, but it shows him as he moves his hand to her pants and appears to quickly put his hand into her pants. As the State points out, a few seconds after he removes his hand, he brings his hand to his mouth.

Aside from this act, Grace testified that Nevilles had taken her to the breakroom where he used his hand to touch her "[b]etween [her] legs" on her "private part" that she uses "to go pee" and that his hand "was moving." She further testified

14

that he had then taken her to the stockroom where he contacted her genitals with his mouth. Thus, the jury heard evidence of three separate acts separated in time and committed in three different locations in the store, and the evidence was such that the jury could find that the contact that occurred in the store area was a discrete act that was not preparatory to the subsequent penetration in the breakroom.

Nevilles points to the nurse's testimony about Grace's narrative to her about what had happened. The nurse testified that Grace told her,

> "So what was happening was we were in Walmart, and . . . [t]his random stranger said, 'You're stealing.' And I said, 'No. My mom said I could come look.['] He took me to another place. For example, the art place. He took my pants off to see if I was stealing and putting his hands in my privates. He took off my pants and then told me to bend down, and I was scared, and I was crying. But he put his mouth on my private part, but I wanted to go and tell my mom.[']"

She did not specify what had happened where or how many times she had been touched. Not only did she not say that Nevilles had touched her with his hand only once, but she used the plural "hands" rather than "hand." That alone is not sufficient to establish multiple acts of touching, but it is consistent with, rather than contrary to, multiple acts of touching. She repeated the use of the plural "hands" when she told the nurse in answer to a question that he had touched her with "[h]is hands and his mouth." Grace's statements to the nurse do not establish a double-jeopardy violation on the face of the record.

Nevilles also points to the prosecutor's opening statement describing the case. In that opening statement, the prosecutor did not discuss what happened in the

15

breakroom and seemed to assert that the sexual assault by penetration had occurred in the auto care aisle. Nevilles further points to the prosecutor's closing argument. Nevilles contends that the prosecutor "clearly indicated that the two offenses were supported by the same conduct." The prosecutor mentioned "what happened in the stockroom and in the break area" and then, after discussing those events, moved on to discussing the indecency-by-contact count. The prosecutor subsequently argued that the evidence showed that penetration had occurred with respect to "Count Three," meaning the indecency count. But it is not clear whether the prosecutor was arguing that penetration had occurred only with respect to count three or had occurred with both count two and count three. Regardless, the prosecutor's arguments are not evidence, *Benefield v. State*, No. 02-14-00099-CR, 2015 WL 4606273, at *5 (Tex. App.—Fort Worth July 30, 2015, pet. ref'd) (mem. op. on reh'g, not designated for publication), and the jury was so instructed.

Because the jury had evidence from which it could find beyond a reasonable doubt that Nevilles committed two separate acts of contacting Grace's genitals with his hands, at least one of which progressed to penetration, we overrule his third point.

### III. Evidentiary sufficiency to prove aggravated kidnapping (2nd point)

In Nevilles's second point, he asserts that the evidence was insufficient to prove beyond a reasonable doubt that he committed aggravated kidnapping.

16

**A. Elements**

The Penal Code sets out several offenses arising from the restraint of another person. *See* Tex. Penal Code §§ 20.02–.04. A defendant commits unlawful restraint if the defendant "intentionally or knowingly restrains another person." *Id.* § 20.02(a). To "restrain" a person "means to restrict a person's movements without consent, so as to interfere substantially with the person's liberty, by moving the person from one place to another or by confining the person." *Id.* § 20.01(1). When the complainant is under fourteen, the restraint is without consent if the child's parent "has not acquiesced in the movement or confinement." *Id.* § 20.01(1)(B)(i).

Unlawful restraint becomes abduction if the restraint is done "with intent to prevent [the person's] liberation by: (A) secreting or holding [the person] in a place where he [or she] is not likely to be found; or (B) using or threatening to use deadly force." *Id.* § 20.01(2) (defining "abduct"). A person who "intentionally or knowingly abducts another person" commits kidnapping. *Id.* § 20.03. If the kidnapping is committed with the intent to abuse the other person sexually, the offense constitutes aggravated kidnapping. *Id.* § 20.04(a)(4). Nevilles challenges only one element of aggravated kidnapping: that he secreted or held Grace in a place where she was not likely to be found.

**B. Analysis**

Under this point, Nevilles argues, "No rational juror could have believed [he] was guilty of secreting [Grace] in a place where she was not likely to be found. She *was*

17

found, only minutes after being taken." He further argues that the dark stockroom where he was discovered with Grace was not locked.

"[T]he offense of kidnapping does not require that the defendant restrain the victim for any particular period of time" or that the "victim be moved any particular distance." *Megas v. State*, 68 S.W.3d 234, 238 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd); *see Johnson v. State*, Nos. 12-21-00215-CR, 12-21-00216-CR, 2022 WL 3452262, at *3 (Tex. App.—Tyler Aug. 17, 2022, pet. ref'd) (mem. op., not designated for publication). Further, kidnapping requires that the actor *intend* to secrete the kidnapped person, not that the person actually succeed, as the Court of Criminal Appeals has explained:

> "Abduct" . . . includes two elements. First, the defendant must have restrained another, which is the *actus reus* requirement. Second, the defendant must have had the specific intent to prevent liberation, which is the *mens rea* requirement. Secreting or holding another where he or she is unlikely to be found is part of the *mens rea* requirement of the offense—not the *actus reus*. This is an important distinction because <u>the State is not required to prove that the defendant actually secreted or held another</u>. Instead the State must prove that the defendant restrained another with the specific <u>intent</u> to prevent liberation by secreting or holding the person. The offense of kidnapping is legally completed when the defendant, at any time during the restraint, <u>forms the intent</u> to prevent liberation by secreting or holding another in a place unlikely to be found.

*Laster v. State*, 275 S.W.3d 512, 521 (Tex. Crim. App. 2009) (underlining added and footnotes omitted); *see Brimage v. State*, 918 S.W.2d 466, 475 (Tex. Crim. App. 1994) (holding that "a kidnapping becomes a completed offense when a restraint is accomplished, and there is evidence that the actor *intended* to prevent liberation and

18

that he *intended* to do so by either secretion or the use or threatened use of deadly force" (emphases added)); *Megas*, 68 S.W.3d at 240.

So, to prove kidnapping, the State had to establish the *act* of restraint and the *intent* to prevent Grace's liberation by preventing her from being found, not that Nevilles successfully prevented her from being found. The evidence that there were customers and employees in the store and that Grace was found not long after he took her does not prevent a finding that he intended to keep her from being found, and the jury had evidence of actions he took to avoid discovery and to keep her away from the other people in the store. The Walmart surveillance video and the testimony of Grace were evidence from which the jury could find that Nevilles continuously moved Grace around the store away from other people, that he was looking for empty, isolated places where he could commit sexual offenses against her, and that each time he committed such an offense, he moved her again. Moreover, the last place he took her before being discovered was a dark storeroom, and he left the lights off while he committed a sexual offense there. The jury could have found that Nevilles *intended* to prevent Grace's liberation by secreting her or holding her in a place where she was unlikely to be found so that he could commit sexual offenses against her. We overrule Nevilles's second point.

## IV. Jury charge (7th point)

Under Nevilles's seventh point, he argues that the trial court reversibly erred by denying his request for a jury charge on unlawful restraint, a lesser-included offense of aggravated kidnapping.

For Nevilles to prevail on this point, the record must contain some evidence that would have permitted the jury to rationally find that if Nevilles was guilty, he was guilty of *only* unlawful restraint.[4] *See Ransier*, 670 S.W.3d at 650; *Ritcherson v. State*, 568 S.W.3d 667, 671 (Tex. Crim. App. 2018). "Meeting this threshold requires more than mere speculation—it requires affirmative evidence that both raises the lesser-included offense and rebuts or negates an element of the greater offense." *Cavazos v. State*, 382 S.W.3d 377, 385 (Tex. Crim. App. 2012). A defendant satisfies that requirement when "there is (1) evidence that directly refutes or negates other evidence establishing the greater offense and raises the lesser-included offense or (2) evidence that is susceptible to different interpretations, one of which refutes or negates an element of the greater offense and raises the lesser offense." *Ritcherson*, 568 S.W.3d at 671. The evidence relied on must "be directly germane to the lesser-included offense." *Cavazos*, 382 S.W.3d at 385. "[T]he defendant may rely on

---

[4]Additionally, the requested lesser offense must be "in fact a lesser-included offense of the charged offense." *Ransier v. State*, 670 S.W.3d 646, 650 (Tex. Crim. App. 2023). There is no dispute in this case that unlawful restraint is in fact a lesser-included offense of kidnapping. *Molinar v. State*, 735 S.W.3d 456, 458 (Tex. App.—Amarillo, pet. ref'd) (citing *Schweinle v. State*, 915 S.W.2d 17, 19 (Tex. Crim. App. 1996), which discussed false imprisonment, now called unlawful restraint).

'anything more than a scintilla of evidence'" in requesting a lesser-included offense instruction, but a defendant is not entitled to such an instruction unless "the evidence establishes the lesser-included offense as a valid, rational alternative to the charged offense." *Williams v. State*, 662 S.W.3d 452, 461–62 (Tex. Crim. App. 2021) (quoting *Hall v. State*, 225 S.W.3d 524, 536 (Tex. Crim. App. 2007)), *cert. denied*, 146 S. Ct. 1600 (Feb. 23, 2026). "[T]he mere disbelief of evidence establishing commission of the greater offense is insufficient by itself to justify submission of a [lesser-included offense] instruction." *Chavez v. State*, 666 S.W.3d 772, 777 (Tex. Crim. App. 2023).

To preserve error regarding the denial of a lesser-included offense instruction, the defendant generally "'must point to evidence in the record that raises' it." *Green v. State*, 713 S.W.3d 865, 875 (Tex. Crim. App. 2025) (quoting *Williams*, 662 S.W.3d at 461). That is, the defendant must set out "the specific evidence that supports a rational basis for rejecting the greater offense but supporting the lesser offense," unless the evidence raising the lesser-included offense "is manifest," meaning that "the grounds for the request would have been obvious to the trial court." *Williams*, 662 S.W.3d at 462–63.

When Nevilles requested the instruction, he did not point out to the trial court what evidence raised it. Thus, he preserved his complaint only if the grounds for it would have been obvious to the trial court. *See id.* On appeal, Nevilles asserts that the breakroom and stockroom were unlocked, that "[t]he store was open for business and employees were coming in and out of all areas of the store," and that "[i]n fact, an

21

employee did find [Grace] and [him] when [the employee] walked in and turned the light on." But even if, for preservation purposes, it would have been obvious to the trial court that he was relying on this evidence for his request, the evidence does not negate or refute an intent to secrete Grace or hide her where she could not be found.

We have already held that the fact that he was discovered with Grace after a relatively short period of time does not negate a finding that Nevilles intended to secrete her or hold her where she would not be found. The fact that the store was open and that the customers and employees were in the store was merely the circumstance in which Nevilles found Grace and the context for his subsequent actions. Once Nevilles stopped Grace, he did not "merely move[ ] her from one place to another" to prevent her liberty, as he argues on appeal. Rather, he continuously moved her away from people and to increasingly empty or less public areas of the store where he could commit sexual offenses against her. Each time he committed one of the acts, he moved her to another, less public location before committing the next act. Moreover, before he was discovered, Nevilles's last stop was to take Grace to a dark room, and he left the lights off while he committed the final sexual offense against her. When a store employee walked in, Nevilles lied that Grace was his daughter.

This evidence showed him doing his best to *avoid* the other people in the store and to find a place secluded enough that he could commit sexual offenses against Grace without discovery or interruption. It is irrelevant that he was ultimately

discovered or that he did not successfully hide her for long before discovery. *See Johnson*, 2022 WL 3452262, at *3. Further, the jury could consider the acts that he committed as evidence of an intent to prevent Grace from being found; to find him guilty of only unlawful restraint, the jury would have had to believe that he was willing to commit or attempt to commit sexual offenses against a child but had no intent to first take her some place where she was unlikely to be found while he committed them.

The evidence that the acts occurred in a store and that Nevilles was discovered with Grace after a relatively short period of time is not evidence that if Nevilles is guilty, he is guilty *only* of unlawful restraint. *See id.* Thus, even if Nevilles preserved his complaint, the trial court did not err by denying his request. We overrule Nevilles's seventh point.

## V. Evidentiary rulings

### A. The parking-outside-a-playground evidence (4th point)

Nevilles's fourth point asserts that the trial court reversibly erred when it overruled his objection to evidence that he parked his car outside a children's playground facility four days after the offense. He argues that he was harmed by the error because it swayed the jury to convict him despite insufficient evidence to prove that he committed sexual assault by penetration and painted him as a serial predator, tainting any decision to convict on any count.

23

## 1. The State's Use of the Evidence at Trial

During trial, the State presented testimony that police officers investigating him for the Walmart incident conducted surveillance outside of Nevilles's Fort Worth home and that several days after the incident, they followed him from his home to a house in Euless and then to a shopping center. Once there, he stopped in front of Kids Empire, an indoor children's playground establishment, and stayed there for three to five minutes. One officer drove past Nevilles's vehicle and parked nearby at a hotel in the shopping center, and after a few minutes, Nevilles drove to the officer's car and asked the officer why he had been following him since Fort Worth. The officer denied that he had been following Nevilles.

The State first mentioned this incident briefly during its opening statement, after which Nevilles's attorney approached the bench and told the trial court that although he had not wanted to object during opening, he wanted a chance to object before the officer testified. When the State called the officer to testify, the trial court held a hearing outside the jury's presence. Nevilles objected that the testimony was "clearly a 403 violation" and was not "relevant to anything, and it's just simply to inflame." The trial court overruled the objections, and the officer testified.

Another officer also testified that the surveillance team had followed Nevilles to Kids Empire, and the State raised the issue again in closing argument. After the defense argued in its closing that the State was trying to inflame the jurors so that they would "take [their] eye off the ball," the prosecutor asserted that Nevilles's parking

outside the Kids Empire was "important" and that it was no coincidence that "the guy . . . convicted of statutory rape in Tennessee, is on video . . . sexually assaulting another underage girl and then, four days later, he's outside of a Kids Empire."

## 2. Harmless Error

The admission of evidence in violation of Rule 403 is nonconstitutional error, and we therefore apply Rule 44.2(b)'s harm standard. Tex. R. App. P. 44.2(b); *Gonzalez v. State*, 544 S.W.3d 363, 373 (Tex. Crim. App. 2018). Under that standard, we disregard the error if it does not affect the appellant's substantial rights. Tex. R. App. P. 44.2(b). A substantial right is affected when the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Haley v. State*, 173 S.W.3d 510, 518 (Tex. Crim. App. 2005); *see King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)). Conversely, an error does not affect a substantial right if the appellate court has a fair assurance from an examination of the record as a whole that the error did not influence the jury or that it had but a slight effect. *Macedo v. State*, 629 S.W.3d 237, 240 (Tex. Crim. App. 2021). In deciding that question, we consider (1) the character of the alleged error and how it might be considered in connection with other evidence, (2) the nature of the evidence supporting the verdict, (3) the existence and degree of additional evidence indicating guilt, and (4) whether the State emphasized the complained-of error. *Cook v. State*, 665 S.W.3d 595, 599 (Tex. Crim.

25

App. 2023). We may also consider the jury instructions, the theories of the case, and any relevant voir dire. *Id.*

The prosecutor emphasized the evidence at trial and characterized it as showing that Nevilles was looking for his next victim just days after sexually assaulting Grace. This weighs in favor of Nevilles's argument that admission of the evidence was harmful. However, the prosecutor also emphasized the other, more probative evidence, including the surveillance video, the DNA evidence, and Grace's and the nurse's testimony. *See Macedo*, 629 S.W.3d at 240 (noting that prosecutor's emphasis of erroneously admitted evidence not harmful when, among other factors, prosecutor also emphasized other evidence that was "far more probative"). In light of all the other evidence, the evidence that he parked outside the playground for a few minutes was relatively insignificant. *See id.* In fact, the testimony from the officer who had followed Nevilles to the indoor playground indicated that Nevilles had suspected that he was being followed from the moment he left his home. From that testimony, the jury could have just as easily inferred that he parked where he did in the shopping center not to look for his next victim but to determine if the officer had been following him. In other words, the evidence was not as strong and unequivocal as the State seemed to want it to be. The evidence that was directly related to his guilt for the charged offenses—for example, Grace's testimony and the Walmart surveillance video—was far more significant, and the video in particular was the kind of evidence

likely to invoke a strong reaction from the jury. The parking-near-the-playground evidence would have had but a slight effect.

Based on our review of the record, even assuming that the trial court abused its discretion by admitting the evidence, we conclude that in the context of the entire case against Nevilles, any error in admitting the evidence did not have a substantial or injurious effect on the jury's verdict and did not affect his substantial rights. We overrule Nevilles's fourth point.

## B. The Tennessee plea agreement

### 1. Sufficient proof of commission of offense (5th point)

In Nevilles's fifth point, he asserts that the trial court reversibly erred when it admitted the Tennessee court documents under Code of Criminal Procedure Article 38.37.

Article 38.37, Section 2 provides that in the prosecution for certain offenses listed in that section, including indecency with a child or sexual assault of a child, the trial court may admit evidence that the defendant has previously committed one of the listed offenses. Tex. Code Crim. Proc. art. 38.37, § 2(a). However, before that evidence may be introduced, the trial court must conduct a hearing outside the jury's presence to "determine that the evidence likely to be admitted at trial will be adequate to support a finding by the jury that the defendant committed the separate offense beyond a reasonable doubt." *Id.* art. 38.37, § 2(b).

Nevilles first argues under this point that the trial court "failed to determine whether the evidence was adequate" to support a finding beyond a reasonable doubt that he had committed the Tennessee offense. He argues that the trial court "merely concluded that it would 'allow such evidence' without specifically determining that the evidence met the standard for admissibility." However, while the trial court must make a determination under Article 38.37, the court need not make an express finding on the record. *See Davis v. State*, No. 02-23-00119-CR, 2024 WL 976501, at *5 (Tex. App.—Fort Worth Mar. 7, 2024, pet. ref'd) (mem. op., not designated for publication) (citing cases). We overrule this part of his fifth point.

Nevilles further argues that the State failed to satisfy its burden because the documents produced by the State indicate that he had pled guilty in exchange for an 120-day jail sentence, which he contends is below the statutory minimum in Tennessee for statutory rape, and "[a]ccordingly, the plea papers do not indicate a plea to the felony offense of Statutory Rape."[5] He asserts, "We have no idea what offense to which [he] ultimately pleaded guilty—or for which he was finally convicted. From the face of the evidence, [he] evidently pleaded guilty to some unknown lesser charge and received a lesser sentence."

---

[5]Nevilles argued in the trial court that if his conviction had been for statutory rape, it was void on the basis that it was below the statutory minimum. But he recognizes in his brief that a person who accepts the benefit of a lesser sentence than the law allows is estopped from subsequently arguing that the sentence is void. *See Deen v. State*, 509 S.W.3d 345, 348, 350–51 (Tex. Crim. App. 2017).

We disagree that the documents reflect that Nevilles had pled guilty to a lesser offense. Included with the documents was a "Petition for Waiver of Trial by Jury and Request for Acceptance of Plea of Guilty." The form petition had a space to insert the charge, and in that space the words "Stat. Rape" had been written. Similarly, the form had blank lines under a heading, "Plea of Guilty to the Offense(s); Time Received; and Place of Confinement." Under that heading was written, "Stat. Rape," "120 days $500," and "Time Served." In other words, Nevilles had been charged with "Stat. Rape" and had pled guilty *to that offense*. The State also produced an order signed by the trial court accepting his plea.

Also included with the documents was a trial court order stating that Nevilles had been charged with "Stat. Rape" and that "having been convicted or having plead [sic] guilty *to the above named offense(s)*, and *heretofore sentenced* to pay fines in the amount of $500.00," had applied to pay the fines in installments, a request granted by the order. Additionally, the State included a document that appears to be a record of actions from the Shelby County Clerk. This document had a section with a column heading "Charges" and a heading for "Dispositions," under which were typed "Statutory Rape" and "Found Guilty, Guilty Plea," respectively. That document also stated that Nevilles had been sentenced on October 30, 2000, which was the same date on which he had signed his plea petition and on which the trial court had accepted it.

29

Thus, though the documents do not include a final judgment from the court reciting the sentence or a record of the hearing at which his sentence was pronounced, they nevertheless show that Nevilles had pled guilty to statutory rape, not some lesser offense, and that the trial court had accepted his plea and had sentenced him. The trial court could have determined from this evidence that it would support a jury finding that he had committed the Tennessee statutory rape offense beyond a reasonable doubt. We overrule the remainder of Nevilles's fifth point.

### 2. 403 objection (6th point)

In Nevilles's sixth point, he argues that the trial court reversibly erred when it admitted the Tennessee court documents under Article 38.37 because the danger of unfair prejudice significantly outweighed any probative value. We disagree.

A Rule 403 analysis considers four non-exclusive factors: "(1) how probative the evidence is, (2) the potential of the evidence to impress the jury in some irrational, but nevertheless indelible way; (3) the time the proponent needs to develop the evidence; and (4) the proponent's need for the evidence." *Colone v. State*, 573 S.W.3d 249, 266 (Tex. Crim. App. 2019). As for the first and fourth factors, "evidence of a separate sexual offense against a child admitted under [A]rticle 38.37, [S]ection 2(b) is probative of a defendant's character or propensity to commit sexual assaults on children." *Dies v. State*, 649 S.W.3d 273, 285 (Tex. App.—Dallas 2022, pet. ref'd). The court documents were therefore probative. Further, although the State's need for the evidence was not as high as it would be in a pure he-said, she-said case, neither was

the need minimal, given the defense's position at trial that the State could not prove penetration or mouth-to-genital contact. Grace was the only person who could provide a firsthand account of Nevilles's actions, and as he argues on appeal, her testimony about the offenses was not as clear and specific as an adult's might have been.

Nevilles argues that the Tennessee court documents had low probative value because that offense had occurred twenty-five years before trial and was therefore too remote. "[R]emoteness alone does not require the trial court to exclude evidence of an extraneous offense under Rule 403," but it is "one aspect of an offense's probativeness [that] the trial court is to consider along with the other factors in the Rule 403 analysis." *Id.* (internal quotation marks and citation omitted). The remoteness of the offense reduced the probative value of the evidence, but considering that it was also a sexual offense against a minor, we cannot say that its remoteness deprived the evidence of all probative value.[6] *See Corley v. State*, 987 S.W.2d 615, 621 (Tex. App.—Austin 1999, no pet.); *see also Suljanovic v. State*, No. 01-23-00204-CR, 2025 WL 863781, at *13 (Tex. App.—Houston [1st Dist.] Mar. 20, 2025, no pet.) (mem. op., not designated for publication).

---

[6]Notwithstanding the limitations on character evidence contained in Evidence Rules 404 and 405, Article 38.37 allows extraneous offense evidence to be admitted "for any bearing the evidence has on relevant matters, including the character of the defendant and acts performed in conformity with the character of the defendant." Tex. Code Crim. Proc. art. 38.37, § 2; *see* Tex. R. Evid. 404, 405.

Nevilles further argues that the Tennessee court documents "do not prove an offense, but merely an allegation" and do not "even prove to what offense [he had] ple[d] guilty," and thus there is no evidence to prove that the conduct to which Nevilles admitted was "in any way similar to the offense for which he was on trial." We have already rejected his arguments that the court documents do not prove the offense to which he had pled guilty.

As for the second factor, although Article 38.37 evidence is admissible for character-conformity purposes, evidence that Nevilles had committed a prior sexual offense against a minor had the potential to cause the jury to be unfairly prejudiced by such evidence. *See Castaneda v. State*, 694 S.W.3d 13, 25 (Tex. App.—Houston [14th Dist.] 2023, pet. ref'd) (noting potential unfair prejudice when prior offense is similar to charged offense). However, the jury charge contained a limiting instruction, which minimized the danger that the jury would consider the evidence for an improper purpose. *See id.* Further, "while evidence of sexual abuse of children is often considered inherently inflammatory," Nevilles "has not demonstrated how the challenged extraneous offense evidence was any more heinous or inflammatory than the evidence pertaining to the charged offense[s]." *Id.*

Finally, as for the time to develop the evidence, the exhibit came in through one of fifteen witnesses presented by the State, and the presentation of the documents takes up about 18 pages in the reporter's record out of the 294 pages containing

witness testimony. Because the evidence did not take an inordinate amount of time to develop, this factor weighs in favor of admissibility. *See id.*

While the evidence was certainly prejudicial, the trial court did not abuse its discretion by determining that a danger of *unfair* prejudice did not substantially outweigh the probative value. We overrule this part of Nevilles's fourth point.

We read Nevilles's brief to also argue that the jury was misled by the evidence. He did not make a Rule 403 objection on this basis, and he therefore did not preserve this part of his complaint. *See* Tex. R. App. P. 33.1; *Checo v. State*, 402 S.W.3d 440, 451 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd). We overrule the remainder of his fourth point.

## VI. Punishment enhancement—sufficient proof of Tennessee conviction for statutory rape (8th and 9th points)

Nevilles's eighth and nine points concern admission during the punishment stage of the documents relating to the Tennessee offense. He asserts in his eighth point that the trial court reversibly erred by allowing the State to seek enhancement of his sentences under Texas Penal Code Section 12.42 because the State failed to prove that he had been previously convicted in Tennessee of an offense substantially similar to an offense listed in Section 12.42(c)(2). Under Nevilles's ninth point, he argues that the evidence was insufficient to prove beyond a reasonable doubt that he had been previously convicted of statutory rape in Tennessee.

For both points, he again argues that the sentence recommended in the plea agreement proved that he had been convicted for some lesser offense and that the State did not "proffer evidence of the offense for which he actually pleaded guilty." He further argues that because the State did not produce evidence that he had been finally convicted of a felony in Tennessee, no rational juror could have found the enhancement allegation true beyond a reasonable doubt.

To prove that a prior conviction exists, "a certified copy of a final judgment and sentence [is] a preferred and convenient means," but "[n]o specific document or mode of proof is required." *Jones v. State*, 572 S.W.3d 841, 848 (Tex. App.—Houston [14th Dist.] 2019, no pet.). As discussed above, the Tennessee court documents produced by the State reflect that Nevilles was charged with statutory rape, that he pled guilty to that offense, that the trial court accepted his plea, and that he was sentenced by the trial court. We overrule Nevilles's eighth and ninth points.

## VII. Cruel and unusual punishment (10th point)

Finally, under his tenth point, Nevilles argues stacking his life sentences is disproportionate to the offenses and constitutes cruel or unusual punishment in violation of the Eighth Amendment to the United States Constitution and Article I of the Texas Constitution.

Nevilles's objection to the State's request for consecutive sentences was, "It's redundant and not necessary. It's punitive in nature." He did not specifically object that the cumulation order constituted cruel and unusual punishment under the Texas

Constitution or the federal constitution. Thus, he has not preserved this complaint for appeal. *Rucker v. State*, No. 07-20-00128-CR, 2021 WL 3772128, at *4 (Tex. App.—Amarillo Aug. 25, 2021, pet. ref'd) (mem. op., not designated for publication); *Hopkins v. State*, No. 03-16-00746-CR, 2018 WL 1660831, at *15–18 (Tex. App.—Austin Apr. 6, 2018, no pet.) (mem. op., not designated for publication). We overrule Nevilles's tenth point.

## Conclusion

Having overruled Nevilles's ten points, we affirm the trial court's judgments.

/s/ Mike Wallach
Mike Wallach
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  July 23, 2026